UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN PAUL LADACH,

        Plaintiff,

v.

CITY OF ROMULUS d/b/a CITY OF
ROMULUS POLICE DEPARTMENT, JADIE
SETTLES, and DERRAN SHELBY,

        Defendants.

_____/

Case No. 17-10554

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING IN PART AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [17]**

This civil rights lawsuit arises out of the discipline, suspension, and demotion of

Plaintiff Kevin Paul Ladach while employed as a police officer for Defendant City of

Romulus.  Plaintiff claims that Defendants retaliated against him for exercising his First

Amendment right of access to the courts and free speech by filing an earlier lawsuit against

Defendant City of Romulus, Defendant Captain Derran Shelby, and former Chief of Police

Robert Dickerson.   Currently before the Court is Defendants' Motion for Summary

Judgement (Dkt. # 17).  Defendants argue that Defendant Shelby and Defendant Jadie

Settles, Director of Public Safety for the City of Romulus, are entitled to qualified immunity.

Defendants also argue that Plaintiff did not engage in protected activity, as he did not speak

as a private citizen on a matter of public concern when he filed his prior lawsuit.  Further,

according to Defendants, Plaintiff cannot establish a *prima facie* case of retaliation, and

Defendants' stated business reasons for their actions were legitimate and not pretextual.

For the reasons stated below, this Court DENIES IN PART Defendants' motion and GRANTS IN PART the motion only as to the official capacity claims against Settles and Shelby.

## I.    FACTS

Plaintiff Kevin Paul Ladach is currently employed with the City of Romulus Police Department ("RPD").  (Dkt. # 19-2, Pg ID 405).  He was hired by RPD as a dispatcher in 1999.  *Id.* at Pg ID 320.  In 2003, the City of Romulus sponsored Plaintiff through the police academy.  *Id.*  From 2003 through 2009, Plaintiff worked as an RPD road patrolman.  *Id.* at Pg ID 321.  He was assigned to the detective bureau in 2009, and he was Detective of the Year in 2010.  *Id.*; Dkt. # 19-3, Pg ID 415.  In July 2011, former Chief of Police Michael St. Andre promoted Plaintiff to Road Patrol Sergeant.  (Dkt. # 19-2, Pg ID 321-22).  In December 2011, after St. Andre was removed from his position following his guilty plea to criminal charges against him, Plaintiff was reassigned to a newly created administrative sergeant position by new Chief of Police Robert Dickerson.  *See id.*; Dkt. # 19-7.  In this new position, Plaintiff had responsibilities in the records bureau, detective bureau, and property and evidence room, and he was designated the Freedom of Information Act ("FOIA") coordinator for RPD.  (Dkt. # 19-2, Pg ID 321-22; Dkt. # 19-4, Pg ID 422).  Defendant Captain Derran Shelby supervised detectives, including Plaintiff.  *See* Dkt. # 19-4, Pg ID 327, 420.

On August 1, 2012, Plaintiff learned that an RPD officer had allegedly punched a handcuffed arrestee in lock-up.  *See* Dkt. # 19-2, Pg ID 324; Dkt. # 19-5, Pg ID 454; *Rataj v. City of Romulus*, 306 Mich. App. 735, 740 (2014).  The incident was captured on surveillance video.  (Dkt. # 19-2, Pg ID 324).  A few days later, the  assaulted person

requested a copy of the surveillance video.  *See* Dkt. # 19-5, Pg ID 454.  Plaintiff made copies of the video because he feared that it would disappear.[1]  *See* Dkt. # 19-2, Pg ID 324-25; Dkt. # 19-5, Pg ID 454-55, 458).  On September 21, 2012, Plaintiff received a FOIA request from an attorney for the surveillance video.  (Dkt. # 19-2, Pg ID 411).  Plaintiff prepared the FOIA packet with the video on a disc and gave it to Dickerson.  *Id.* at Pg ID 326.  Subsequently, Shelby asked Plaintiff to meet with him and Dickerson, and they ordered Plaintiff to destroy his copies of the video.  *Id.* at Pg ID 325-26; Dkt. # 19-10.  On October 5, 2012, Plaintiff contacted the Michigan Attorney General's ("AG") Office to report Dickerson's order to destroy his copies of the video, which Plaintiff believed to be evidence of a crime.  (Dkt. # 19-2, Pg ID 325; Dkt. # 19-9, Pg ID 506).  On October 8, 2012, Plaintiff gave Shelby a memo detailing his AG report.  (Dkt. # 19-4, Pg ID 421; Dkt. # 19-10).  Plaintiff's contact with the AG's office was common knowledge within RPD.  (Dkt. # 19-11, Pg ID 514).

On January 9, 2013, Plaintiff reported to Dickerson that Shelby received pay for days that he did not work.  *See* Dkt. # 19-12; Dkt. # 19-9.  Plaintiff was soon after relieved of his duties in the detective bureau and transferred to being a road patrol sergeant.  *See* Dkt. # 19-5, Pg ID 461-62.  On January 31, 2013, Deputy Chief John Leacher issued Plaintiff an oral reprimand for failing to check his subpoena box, which resulted in an officer going to court and being compensated for four hours of overtime when he was no longer needed.  *See* Dkt. # 19-14.  This was Plaintiff's first-ever discipline, and he disputed it.  *See* Dkt. #

---

[1]At the time, the Michigan State Police ("MSP") and the Federal Bureau of Investigation ("FBI") were investigating RPD for corruption, and several RPD officers, including St. Andre, were eventually convicted of various criminal offenses.  *See* Dkt. # 19-6; Dkt. # 19-7; Dkt. # 19-8.

19-2, Pg ID 327; Dkt. # 19-9.    Plaintiff reported to Leacher and HR that Shelby recommended this discipline because Plaintiff reported Shelby's suspected payroll fraud. *Id.*

In February 2013, Plaintiff filed a lawsuit against Dickerson, Shelby, and the City of Romulus alleging that the defendants had retaliated against him because he refused to destroy evidence of suspected criminal activity, reported suspected illegal activity to RPD and the AG's Office, and exercised his free speech rights.  *See* Dkt. # 19-5, Pg ID 463.

On September 12, 2013, Shelby ordered Lieutenant Phil Czernik to investigate Plaintiff for an alleged failure to collect evidence.  (Dkt. # 19-4, Pg ID 426; Dkt. # 19-16). Czernik found no violations and recommended no discipline for Plaintiff.  (Dkt. # 19-4, Pg ID 426; Dkt. # 19-17).  Shelby overrode Czernik's recommendation and recommended that Plaintiff be issued a written reprimand.  (Dkt. # 19-4, Pg ID 426; Dkt. # 19-18).  Deputy Chief Leacher issued Plaintiff a written reprimand.  *Id.*; Dkt. # 19-19.  Shelby testified at his deposition that he did not know of any other time when he disciplined a subordinate in a situation where the investigating officer found no violation.  (Dkt. # 19-4, Pg ID 427).  On December 14, 2013, Leacher suspended Plaintiff for five days without pay for insubordination after Plaintiff disobeyed Shelby's order to address a prisoner concern, was disrespectful to Shelby, and yelled at Shelby.  (Dkt. # 19-20).  Plaintiff filed a grievance, and this suspension was reduced to a two-day suspension.  (Dkt. # 19-2, Pg ID 329).

In May 2014, Plaintiff, Dickerson, Shelby, and the City of Romulus settled the 2013 lawsuit.  (Dkt. # 19-21).  The settlement agreement required the removal of any written reprimands and oral counseling in Plaintiff's personnel file as of May 2014.  *Id.* at Pg ID 564; Dkt. # 19-2, Pg ID 327-28.  It also required the removal of the five-day suspension if

Plaintiff had no further disciplinary action taken against him during the course of his employment within that year. (Dkt. # 19-21, Pg ID 564).

On August 27, 2014, Plaintiff was promoted to Lieutenant. (Dkt. # 19-22). This promotion was mandated by a letter of understanding, signed in October 2012, between Plaintiff's union and the City of Romulus. *See* Dkt. # 19-23. Captain Joshua Monte became Plaintiff's direct supervisor. (Dkt. # 19-2, Pg ID 332). However, Plaintiff still received some correspondence from Captain Shelby about police report corrections. *Id.*

In November 2014, Defendant Jadie Settles became the Director of Public Safety at RPD. *See* Dkt. # 19-24; Dkt. # 19-2, Pg ID 330; Dkt. # 17-5, Pg ID 175. Settles joined the City of Romulus while Dickerson was the mayor's Chief of Staff. (Dkt. # 17-5, Pg ID 175). Settles had previously worked with Dickerson at the Wayne County Sheriff's Office for 25 years, and the two are friends, play golf together one to two times per month, and socialize occasionally. *Id.* at Pg ID 174-75, 191. Dickerson had told Settles at least some details about Plaintiff's 2013 lawsuit. (Dkt. # 17-5, Pg ID 192).

On November 15, 2014, Plaintiff ordered the termination of a police chase. *See* Dkt. # 19-25. Shelby ordered Sergeant Roger Salwa to investigate Plaintiff's performance as shift commander during that incident. (Dkt. # 19-2, Pg ID 377-78; Dkt. # 19-4, Pg ID 446). Salwa found no violation or wrongdoing on Plaintiff's part. (Dkt. # 19-2, Pg ID 377; Dkt. # 19-4, Pg ID 446). Plaintiff testified that Salwa told him in confidence that, after he completed his investigation, Shelby asked Salwa to look harder to try to find some violation by Plaintiff. (Dkt. # 19-2, Pg ID 377). According to Plaintiff, this is the first and only time he is aware of that a sergeant, a subordinate officer, has been ordered to investigate a lieutenant, a superior officer, at RPD. (Dkt. # 19-25, Pg ID 577).

5

In February 2015, Plaintiff met with Settles and spoke to him about the 2013 lawsuit. *See* Dkt. # 19-2, Pg ID 336-37; Dkt. # 17-5, Pg ID 178. Settles asked Plaintiff if he could put all that behind him and get along with Shelby, and Plaintiff replied that he could not. (Dkt. # 19-2, Pg ID 337; Dkt. # 17-5, Pg ID 178). Settles testified that he was disappointed with Plaintiff's response. (Dkt. # 17-5, Pg ID 178). According to Plaintiff, this is when his relationship with Settles completely changed and became retaliatory. (Dkt. # 19-2, Pg ID 337). Settles spoke with Shelby, and Shelby confirmed that he had been grooming Plaintiff to be a supervisor but that their relationship deteriorated around the time of the MSP and FBI investigations into RPD. (Dkt. # 17-5, Pg ID 179). Settles began monitoring interactions between Shelby and Plaintiff in order to determine whether any future discipline issued to Plaintiff from Shelby was warranted. *Id.*

On March 17, 2015, Plaintiff and Lieutenant Damian Hull were ordered to send an officer to the Romulus library to read to children. (Dkt. # 19-26; Dkt. # 19-11, Pg ID 525). When no officer showed, Shelby received a call from the library and may have told Monte. (Dkt. # 19-4, Pg ID 438). Monte issued Plaintiff a written reprimand and issued Hull an oral reprimand. (Dkt. # 19-2, Pg ID 323, 361; Dkt. # 19-11, Pg ID 525; Dkt. # 19-26; Dkt. # 19-27). Monte did not discuss the discipline with anyone before issuing the reprimands. (Dkt. # 19-11, Pg ID 526). Monte testified that he gave Plaintiff a written reprimand because he had a few oral reprimands in the years before the library incident. *Id.* at Pg ID 525. Plaintiff notes that all prior written and oral reprimands had been removed from his personnel file per the settlement agreement, and that Hull had received a discipline prior to the library incident. *See* Dkt. # 19-28. Plaintiff acknowledged that he let the City of Romulus down when he failed to send an officer to the library for an important event. (Dkt. # 19-2, Pg ID

361-62).  Nevertheless, Plaintiff asked Settles why he was given a harsher discipline than Hull for the same infraction.  Plaintiff complained that Shelby was harassing him because Plaintiff filed his 2013 lawsuit.  *Id.* at Pg ID 341-42.  According to Plaintiff, Settles responded that Hull should have probably received a written reprimand as well.  *Id.* at Pg ID 362.  Settles reduced Plaintiff's discipline to an oral reprimand.  *Id.* at 363; Dkt. # 17-5, Pg ID 177.

On April 2, 2015, Shelby issued Plaintiff a written reprimand because Plaintiff failed to sign subpoenas.  (Dkt. # 19-29; Dkt. # 19-2, Pg ID 343; Dkt. # 19-4, Pg ID 439-40).  Although Shelby was not Plaintiff's direct supervisor at the time, Shelby testified that he issued the discipline because the incident directly impacted his operations.  (Dkt. # 19-4, Pg ID 440).  Plaintiff admits that he did forget to put his signature on the subpoenas.  (Dkt. # 19-2, Pg ID 343).  Sergeant Labrit Jackson received oral counseling for this same infraction.  *Id.* at Pg ID 367; Dkt. # 19-4, Pg ID 440.  According to Plaintiff, in September 2014, Shelby ordered him to conduct an investigation into subpoena violations.  (Dkt. # 19-25, Pg ID 577).  Plaintiff investigated and reported that Sergeant Derek Turner had violated the subpoena protocol, but Turner was never disciplined for this particular infraction.[2]  *Id.*; Dkt. # 19-2, Pg ID 367.  Shelby testified that the other officers immediately corrected their behavior with regard to the subpoena protocol and did not make excuses, unlike Plaintiff.  (Dkt. # 19-4, Pg ID 440-41).  Settles reduced Plaintiff's discipline to an oral reprimand.  (Dkt. # 17-5, Pg ID 178).  Regarding the two discipline reductions, Settles testified that, in his opinion, the original disciplines were warranted but that he was new to RPD and wanted

----

[2]Turner was, however, subsequently demoted and terminated based on 37 charges against him for a variety of violations.  (Dkt. # 17-5, Pg ID 186).

to show the officers that everyone could start fresh and move forward under his leadership. *Id.* at Pg ID 179.

On April 20, 2015, Shelby issued Plaintiff a written reprimand because Plaintiff did not return a police report correction to Shelby quickly enough. (Dkt. # 19-2, Pg ID 343). Shelby testified that he, and not Monte, issued this discipline because the report and investigation impacted Shelby's area of responsibility. (Dkt. # 19-4, Pg ID 443). Monte testified that Shelby oversaw report corrections for all of RPD. (Dkt. # 19-11, Pg ID 522). The report was authored by Sergeant Eric Harris, and Plaintiff gave the report back to him for correction. (Dkt. # 19-2, Pg ID 344). The corrections were completed 3-4 weeks later. *Id.* Plaintiff testified that report corrections should be done as quickly as possible. (Dkt. # 19-2, Pg ID 343-44). His response to Shelby was that Harris had advised him that he had made multiple attempts to contact the suspect for a statement and never received an answer. (Dkt. # 19-4, Pg ID 443). Shelby testified that, in his opinion, Plaintiff had accepted an insufficient explanation from Harris. *Id.* at Pg ID 444. Plaintiff took a photograph of a file cover sheet to show that another Lieutenant, Hull, was not being reprimanded for a report correction that had been outstanding for many months. (Dkt. # 19-30, Pg ID 587; Dkt. # 19-2, Pg ID 345-49). Plaintiff complained to Settles and Shelby that he was the only command officer being singled out for this kind of retaliatory discipline and pointed out Hull's report correction that had been outstanding for much longer. (Dkt. # 19-2, Pg ID 345-49). Settles and Shelby responded that Plaintiff needed to just worry about himself. *Id.* Shelby and Monte testified that Hull was having a problem with Turner not completing report corrections in a timely manner, and that Hull talked to Shelby and Monte about this issue several times. (Dkt. # 19-4, Pg ID 444; Dkt. # 19-11, Pg ID 530-32).

Turner was disciplined for failure to timely complete reports and report corrections, which was part of his termination. (Dkt. # 19-11, Pg ID 530-31). Hull received a written reprimand for failing to document the issue Turner had regarding report corrections. *Id.* at Pg ID 530. According to Shelby, the other Lieutenants were never late on report corrections and did not make excuses. (Dkt. # 19-4, Pg ID 444).

In August 2015, Plaintiff reported probationary dispatcher Sarah Rodriguez's job performance issues to Monte and Salwa at a staff meeting. Plaintiff was on vacation at the time and offered to document the issues upon his return, but Monte told him not to worry about it and that he would have another officer do it. (Dkt. # 19-2, Pg ID 382). On September 4, 2015, Monte ordered Plaintiff to answer questions in writing about Rodriguez's job performance issues, and about any bullying behavior displayed by several other officers on Plaintiff's shift. (Dkt. # 19-35). On September 15, 2015, Plaintiff responded that Rodriguez felt harassed by Settles and Shelby when they repeatedly asked her for call times. (Dkt. # 19-34, Pg ID 616). Plaintiff further wrote that Rodriguez told him that Settles gave her "the creeps" when he sat down next to her, leaned on a table and stated, "Let me holla at you." *Id.* Plaintiff admits that he failed to document in writing Rodriguez's performance issues and failed to report or document in writing her feelings of being harassed and "creeped out" by Settles. (Dkt. # 19-2, Pg ID 371-75). However, Plaintiff maintains that he did not need to document any complaint of harassment because he witnessed the entire incident between Rodriguez and Settles, and it did not meet the City's definition of harassment. *Id.* at Pg ID 371. Settles testified that when he read Plaintiff's answers he immediately wanted an investigation because he did not want any complaints of harassment against him. (Dkt. # 17-5, Pg ID 180). Rodriguez subsequently

denied ever being harassed by any member of RPD.  (Dkt. # 19-38; Dkt. # 19-11, Pg ID 523).

On September 29, 2015, Settles ordered Plaintiff to appear for a disciplinary Director's Hearing.  (Dkt. # 19-37).  Monte testified that he initiated the request for a Director's Hearing without input from Shelby.  (Dkt. # 19-11, Pg ID 522).  Monte wanted to lay out the problems that were going on with Plaintiff's shift that were not being rectified.  *Id.* at Pg ID 521.  According to Monte, these included officers not using the K-9s in the way they were supposed to be utilized; officers with performance issues, including problems with response time; officers not being courteous to other officers; Plaintiff's lack of trust in his superiors and not being receptive to coaching from any of his superiors; and Plaintiff's failure to hold the officers in his shift accountable for their productivity and attitudes; and the issues with Rodriguez.  *Id.* at Pg ID 517-21.  According to Monte, Plaintiff was not responding to progressive discipline, and Plaintiff's shift was the only one with officers who were not getting along.  *Id.* at Pg ID 521; *see* Dkt. # 19-33.

The Director's Hearing was held on October 7, 2015, and Settles found Plaintiff guilty of the following policy violations:

Count I

Failed to take appropriate actions and corrective measures with a probationary employee whose work performance was unsatisfactory.

Failed to document and properly address radio issues with appropriate discipline.

Failed to document and properly address Probationary Employee who displayed attitude issues.

Count II

Lacks the competency to perform the duties and assume the responsibilities of Shift Lieutenant in a manner that is consistent with the functions and goals of the department.

Fail's [sic] to monitor, evaluate and take corrective measures for low performing officers.

Fail's [sic] to take initiative to correct deficiencies within his authority and report deficiencies in all matters beyond his authority to his commanding officers.

Fails to work in Unisom [sic] and cooperate with upper command and administrators to seek ways to deliver effective, lawful, efficient, safe services to the general public and to accomplish the Mission of the Romulus Police Department which is needed in today [sic] society.

(Dkt. # 19-39; Dkt. # 19-40).

On October 16, 2015, Settles signed an Order of Discipline suspending Plaintiff for 30 days without pay and demoting him from Lieutenant to patrolman. (Dkt. # 19-40). Shelby also signed this Order as a witness. *Id.* Shelby testified that he did not recommend this discipline, and that Settles never spoke with him regarding the decision to impose this discipline nor did he ask Shelby's opinion about this discipline. (Dkt. # 17-6, Pg ID 237). Plaintiff's union filed a grievance, and the matter was submitted to binding arbitration. *See* Dkt. # 19-41; Dkt. # 19-42. Chief of Staff Dickerson reduced Plaintiff's discipline to a 30-day suspension without pay and demotion from Lieutenant to Sergeant. (Dkt. # 17-10; Dkt. # 19-2, Pg ID 330-31).

On October 13, 2015, Shelby asked Plaintiff to complete a misdemeanor warrant request packet. (Dkt. # 19-31; Dkt. # 19-2, Pg ID 352). Plaintiff did not understand why Shelby sent him the packet because the incident involved a felony, and the detective bureau completes all felony warrant packets. (Dkt. # 19-2, Pg ID 352; Dkt. # 19-11, Pg ID 533-34; Dkt. # 17-5, Pg ID 188-89). Plaintiff reported to Monte that Shelby was retaliating

against him by creating unnecessary work for him before finding out whether the prosecutor wanted to charge the incident as a felony or misdemeanor. (Dkt. # 19-32; Dkt. # 19-2, Pg ID 353). Shelby testified that he sent this case to Plaintiff because the case involved domestic violence, and the prosecutor had suggested it be handled at the local level. (Dkt. # 19-4, Pg ID 447). Monte testified that he asked Shelby about this, and Shelby told him that the prosecutor had requested that a misdemeanor warrant packet be submitted. (Dkt. # 19-11, Pg ID 533). Settles assigned an internal affairs detective to investigate this incident after Plaintiff complained, and the detective concluded that Shelby had not violated any policies. (Dkt. # 17-5, Pg ID 188).

On September 22, 2016, the arbitrator concluded that the discipline issued following the Director's Hearing was extreme and unwarranted:

> [T]he Director of Public Services issued an extreme form of discipline. The demotion from Lieutenant to Patrol Officer and a thirty (30) days suspension, without pay, was guaranteed to cause Grievant to lose thousands of dollars in the course of his career . . . After a thorough review of the record, I find that the City has not sustained its burden of proof for establishing just cause for a demotion and a thirty (30) day suspension without pay. . . . [T]he evidence established that Grievant did not always communicate properly but it is not true that he had no idea about what was going on during his shift, or that he deliberately neglected his duties.

(Dkt. # 19-41, Pg ID 644, 646). The arbitrator further found that Rodriguez's harassment complaint was not made as a formal complaint and did not qualify as harassment as prohibited by City policy. While Plaintiff did not document Rodriguez's performance issues or discipline her, the arbitrator noted that he attended a meeting while on vacation to speak to a supervisor about Rodriguez, and they agreed to return her to training. *Id.* at Pg ID 647. The arbitrator found that Plaintiff's supervision and attempts to improve Rodriguez's

performance were appropriate. *Id.* at Pg ID 648. Regarding Plaintiff's trust issues with his commanding officers and discipline record, the arbitrator concluded as follows.

> Grievant told the Director he did not trust management and thought he was being retaliated against because of the lawsuit he had previously filed against the City that had been settled. Grievant told the Director that one of the two Department Captains had refused to speak to him ever since. The Director found this most disturbing and considered Grievant unfit to be part of the management team. . . .
>
> During the Director's hearing Grievant told the Director that he did not trust him or the two Captains in his chain of command. He stated he thought he was being singled out and disciplined for things that other Lieutenants did and received no discipline. This caused the Director to conclude that Grievant was not an effective member of the management team and tended to blame others for his deficiencies rather than cooperating with Command Officers and administrators to provide the best service possible. On this issue, I note it came up at the hearing at a time when emotions were elevated. This perhaps, explains the severity of the Grievant's discipline. In the final analysis, however, I find that Grievant's views about his Captains and Director are not legitimate grounds for extreme discipline until they adversely affect his performance in a serious way. Under the facts of this case, Grievant's performance was not perfect, but I find there was no just cause for severe discipline. A review of his record also does not provide just cause for severe discipline. Grievant was reprimanded three times in the spring of 2015. At the time [h]e had been a Lieutenant for less than a year. Nothing in the record suggests a repeat of these problems so I find they are not just cause for the discipline at issue here. There is also some accusation that Grievant did not properly investigate a dent in a police car and also did not properly assign the K-9 Unit on his shift. However, no discipline was imposed for these alleged deficiencies and again, I find they are not grounds for severe discipline.

*Id.* at Pg ID 648. Plaintiff was restored to Lieutenant, given back pay, and issued a written reprimand. *See id.* at Pg ID 649; Dkt. # 19-2, Pg ID 331, 387-88. In December 2016, the union and the City of Romulus agreed that Shelby and Settles would limit their contact with Plaintiff "until such time as there is a final disposition of the hostile work environment complaint." (Dkt. # 19-43).

## II.    STANDARD OF REVIEW

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotation marks omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The nonmoving party's version of the facts must be relied upon unless blatantly contradicted by record evidence, such as a video recording. *Scott v. Harris*, 550 U.S. 372, 378, 380-81 (2007).

## III. ANALYSIS

### A. Whether Plaintiff Can Establish a *Prima Facie* Case of Retaliation

In a constitutional retaliation case, the plaintiff has the burden of establishing a *prima facie* case, which consists of three elements: (1) the plaintiff engaged in a constitutionally protected activity; (2) the defendant took an adverse action which caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part by the

plaintiff's protected conduct.  *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585-86 (6th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  "If the plaintiff meets this burden, the burden of production shifts to the defendant, . . . but if the defendant can show he would have taken the same action in the absence of the protected activity, he is entitled to summary judgment." *Jenkins*, 513 F.3d at 586 (citing *Thaddeus-X*, 175 F.3d at 399).  In this case, the parties dispute the first and third elements of the *prima facie* case.

### 1. Whether Plaintiff Engaged in Constitutionally Protected Activity

Defendants argue that Plaintiff did not engage in First Amendment protected activity when he filed his 2013 lawsuit because he did not speak as a citizen on a matter of public concern, but rather, complained of an employment dispute related to matters involving his job duties.

Plaintiff responds that he filed his lawsuit as a citizen, not as an employee.  He maintains that filing a lawsuit alleging that RPD leadership ordered him to destroy evidence, obstruct justice, and cover up an assault of a private citizen by an officer, as well as monitoring Shelby's payroll records and reporting suspected fraud, were not part of Plaintiff's official job duties as a detective or FOIA coordinator.  Plaintiff further argues that his speech and lawsuit were matters of public concern because they concerned the cover-up of a prisoner assault, theft of public funds, and obstruction of justice by RPD officers.  Plaintiff notes that when he filed his lawsuit, RPD was under investigation for embezzlement, mishandling evidence, and other potential crimes.

A public employee does not relinquish all his First Amendment rights by virtue of government employment.  *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.,*

15

*Ill.*, 391 U.S. 563, 568 (1968). However, when a public employee sues a government employer under the First Amendment Speech Clause and/or Petition Clause, the employee must show that he or she spoke as a citizen on a matter of public concern rather than as an employee on a matter only of personal interest. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 386, 398-99 (2011). Courts must balance the interest of an employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees. *Pickering*, 391 U.S. at 568. This balancing approach "reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983). The balancing approach also recognizes that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004).

With these principles in mind, the Court must determine whether Plaintiff engaged in constitutionally protected activity by answering: (i) whether Plaintiff spoke as a citizen; (ii) whether Plaintiff spoke on a matter of public concern; and (iii) whether Plaintiff's speech interest in commenting on matters of public concern outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. *See Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 462 (6th Cir. 2017).

      i. Whether Plaintiff Spoke as a Citizen

Public employees do not speak as citizens for First Amendment purposes when they make statements pursuant to their official duties, in which case the Constitution does not insulate their communications from employer discipline. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 543 (6th Cir. 2007). The content of an employee's speech informs the threshold inquiry of whether the speech was made pursuant to an employee's official duties. *Weisbarth*, 499 F.3d at 545. "[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014). In *Lane*, the Supreme Court stressed that the importance of public employee speech is especially evident in the context of a public corruption scandal. *Id.* at 2380.

In this case, Plaintiff filed a lawsuit in 2013 alleging that the City of Romulus, Dickerson, and Shelby retaliated against him in violation of his First Amendment rights because he reported suspected unlawful activity to the Michigan AG's Office, refused to destroy a video of a fellow officer assaulting an arrestee, and reported to the City of Romulus Human Resources Department that he believed Shelby had received pay for time that he did not work. Filing such a lawsuit was clearly outside of Plaintiff's ordinary duties as an RPD officer and FOIA coordinator, which included processing FOIA requests and preserving police videos. Plaintiff was not employed to file such a lawsuit. Although they concerned information acquired by virtue of Plaintiff's public employment, the statements in Plaintiff's 2013 lawsuit were not made pursuant to Plaintiff's official duties as a detective

or FOIA coordinator. The mere fact that Plaintiff's 2013 complaint referenced some of Plaintiff's job duties did not transform the lawsuit into employee speech. *See Garcetti*, 547 U.S. at 421-22 (noting that the controlling factor in determining that the employee did not speak as a citizen was that he wrote his internal memo because that was part of what he was employed to do, and distinguishing *Pickering* where the employee spoke as a citizen when he wrote a letter to a newspaper which had no official significance and bore similarities to letters regularly submitted by other citizens).

In *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 542 (6th Cir. 2012), the Sixth Circuit determined that the employee spoke as a citizen because her speech concerned improper use of funds; the speech was directed to an audience both inside and outside of her department; the speech directed to individuals outside of her department was clearly not part of her official duties; the employee was not asked to investigate or give her opinion on the alleged misconduct; and her comments were extraordinary rather than everyday communications. The same reasoning applies in this case. Plaintiff's speech concerned improper use of funds when Shelby was allegedly paid for time that he did not work, as well as suspected corruption in order to cover up an officer's assault on a handcuffed arrestee. The lawsuit was not internal communication within Plaintiff's department; rather, it became a part of the public record when it was filed in federal court, and filing it was not part of Plaintiff's official duties. Plaintiff was not asked to investigate or give his opinion on the alleged misconduct, and the filing of the lawsuit was an extraordinary rather than everyday work communication. Accordingly, the Court concludes that Plaintiff spoke as a citizen when he filed his 2013 lawsuit.

ii. Whether Plaintiff Spoke on a Matter of Public Concern

18

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. However, courts do not look at the employee's motivation for speaking in making this determination. *Handy-Clay*, 695 F.3d at 543-44. A matter of public concern is a subject of legitimate news interest and of general political or social interest and value to the public at the time of publication. *Roe*, 543 U.S. at 83-84; *Lane*, 134 S. Ct. at 2380. "[P]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law, when exposing graft and corruption, and when seeing that public funds are not purloined or wasted." *Handy-Clay*, 695 F.3d at 543 (internal quotation marks omitted) (quoting *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 576 (6th Cir. 1997)). Speech that addresses failure to follow state law, major state policy decisions, or discrimination also addresses a matter of public concern. *See Boulton v. Swanson*, 795 F.3d 526, 532 (6th Cir. 2015) (collecting cases). In contrast, mere assertions of incompetence and poor management decision-making are run-of-the-mill employment disputes and do not address a matter of public concern. *Id.* Similarly, speech regarding internal departmental morale or performance of or change in an employee's own duties is not a matter of public concern. *See Weisbarth*, 499 F.3d at 547. "It is not necessary for the entire expression [at issue] to address matters of public concern, as long as some portion of the speech does." *Mayhew*, 856 F.3d at 467-68 (internal quotation marks and citations omitted) (noting that the employee's complaint e-mail included a personal grievance about a disliked supervisor and bleak future job prospects as well as allegations that the town had failed to follow its own

hiring policies when it allegedly promoted two unqualified individuals, and concluding that the employee complaint constituted speech about a public concern).

Plaintiff's 2013 complaint alleged that the City of Romulus, Dickerson, and Shelby retaliated against him in violation of his First Amendment rights because he reported suspected unlawful activity to the Michigan AG's Office, refused to destroy a video of a fellow officer assaulting an arrestee, and reported to the City of Romulus Human Resources Department that he believed Shelby had received pay for time that he did not work. It further alleged that Dickerson had not commenced a timely investigation of the alleged prisoner assault, had denied the victim's request for the video of the alleged assault, had informed Plaintiff that he did not want to give the video to the victim so the victim could utilize the services of an attorney to complete a complaint packet, and had ordered Plaintiff to destroy the digital copy of the video from Plaintiff's RPD computer. According to the 2013 complaint, Plaintiff reported suspicions of a possible cover-up to the AG's Office. Plaintiff also reported to the City of Romulus Human Resources Department that he believed Shelby had received pay for time that he did not work. In his 2013 complaint, Plaintiff claimed that the defendants retaliated against him by transferring him from the detective bureau to road patrol sergeant, which caused him to lose a 5% pay increase, the Detective title, his City vehicle and City cell phone, more desirable work shifts, and the privilege of scheduling his own overtime. A fair reading of the 2013 complaint indicates that, while it contained a personal grievance regarding the transfer and loss of certain benefits, it also contained allegations of a cover-up and corruption at RPD involving the mistreatment of a detained arrestee, as well as misuse of public funds. The allegations of a cover-up, corruption, and misuse of public funds are matters of public concern, and

Plaintiff's lawsuit informed the public about important aspects of RPD's functioning and operations and exposed alleged governmental inefficiency and misconduct, regardless of Plaintiff's motivation for filing his complaint, and regardless of the fact that a portion of the lawsuit addressed a personal grievance. *See Lane*, 134 S. Ct. at 2380*; Roe*, 543 U.S. at 84*; Handy-Clay*, 695 F.3d at 543-44; *Boulton*, 795 F.3d at 532; *Mayhew*, 856 F.3d at 467-68. The forum in which Plaintiff's lawsuit was filed, federal court, also supports the conclusion that it related to a matter of public concern. *See Guarnieri*, 564 U.S. at 398. The lawsuit was addressed to a public audience, filed outside of the workplace, and involved some content outside of Plaintiff's duties as an RPD employee. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 466 (1995). The Court concludes that Plaintiff spoke on a matter of public concern.

> iii. Whether Plaintiff's Speech Interest Outweighs the State's Interest in Promoting Efficiency

As the Sixth Circuit has explained,

> In order to justify a restriction on speech of public concern by a public employee, [the] plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers. The state bears the burden of showing a legitimate justification for the [restriction]. [Courts] look for evidence of the impact of the statement on the city's legitimate organizational interests.

*Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 899 (6th Cir. 2001) (quoting *Meyers v. City of Cincinnati*, 934 F.2d 726, 730 (6th Cir. 1991)).

In this case, Defendants do not argue that Plaintiff's 2013 lawsuit disrupted the efficient operation of RPD, and there is no evidence in the record to suggest that was the

case. The record indicates that following the filing of his lawsuit, Plaintiff continued to perform his duties and was promoted shortly after the lawsuit settled. The Court concludes that, in this case, Plaintiff's speech interest in commenting on matters of public concern outweighed RPD's interest in promoting the efficiency of the public services it performs through its officers.

The Court further concludes that Plaintiff's exercise of his First Amendment right to petition and speak on issues of public concern when he filed his 2013 lawsuit is therefore constitutionally protected from retaliation.

### 2. Whether Plaintiff's Prior Lawsuit was a Substantial Motivating Factor in the Adverse Employment Actions

To establish his *prima facie* case of retaliation, Plaintiff must next show that the adverse actions he complains of were motivated at least in part by his protected conduct, the filing of his 2013 lawsuit.

Defendants argue that there is no temporal proximity between the 2013 lawsuit and the suspension and demotion in October 2015. Defendants further argue that there is no causal nexus between the 2013 lawsuit and the 2015 suspension and demotion because it was Monte who initiated the request for a Director's Hearing in 2015 after noticing several issues with Plaintiff's performance, without input from Shelby, and because Monte and Settles were not parties to the prior suit and Settles was not yet employed by the City of Romulus at the time. Defendants note that Plaintiff does not claim that Monte had any retaliatory animus against him. Defendants further note that Settles attempted to work with Plaintiff and reduced two written reprimands to oral reprimands at Plaintiff's request. Citing *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392 (6th Cir. 2010), Defendants also

maintain that there is not sufficient evidence to permit an inference of retaliatory motive because they had ample legitimate reason to suspend and demote Plaintiff.

Plaintiff responds that he was subjected to unwarranted investigations, disciplines, and demotions because of his 2013 lawsuit. He argues that Shelby resented him for filing his 2013 lawsuit and subjected him to retaliation and influenced the adverse employment actions against Plaintiff after the lawsuit settled. Plaintiff maintains that there is a genuine issue of material fact because Plaintiff was disciplined differently and more harshly than other officers who engaged in the same violations.

To establish the causation element of a *prima facie* case of constitutional retaliation, the plaintiff must show that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Rondigo, L.L.C. v. Casco Twp., Mich.*, 330 F. App'x 511, 523 (6th Cir. 2009). "A 'motivating factor' is essentially but-for cause—without which the action being challenged simply would not have been taken." *Vereecke*, 609 F.3d at 400 (internal quotation marks and citations omitted). If an individual defendant's animus against a coworker's exercise of First Amendment rights is a link in the causal chain that leads to the adverse employment action, the individual defendant may be liable even if he is not the final decisionmaker. *See Sims v. City of Madisonville*, 894 F.3d 632, 639-40 (5th Cir. 2018) (collecting cases and explaining that individual liability for a government official who violates constitutional rights turns on traditional tort principles of but-for causation). An adverse employment action taken in retaliation for the exercise of a constitutionally protected right is actionable even if the act would have been proper had it been taken for a different reason. *See Hazel v. Quinn*, 933 F. Supp. 2d 884, 888 (E.D. Mich. 2013) (citations omitted).

In determining whether a causal connection exists, courts can look to circumstantial evidence, including the timing of events and disparate treatment of similarly situated individuals. *Id.* "[T]he more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with other evidence of retaliatory conduct to establish causality." *Id.* (internal quotation marks omitted) (quoting *Mickey v. Zeidler Tool & Die Co.*, 526 F.3d 516, 524-25 (6th Cir. 2008)). The plaintiff must "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003) (internal quotation marks and citations omitted).

Viewing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the record indicates as follows. Plaintiff maintained an unblemished employment record with RPD for fourteen years, including being recognized in 2010 as Detective of the Year and various promotions in 2003, 2009, and 2011. All of the problems at issue in this case occurred in the three years after Plaintiff filed his 2013 lawsuit. Shelby recommended that Plaintiff receive his first-ever discipline three months after Plaintiff contacted the AG's Office regarding the suspected assault cover-up and a few weeks after Plaintiff reported that Shelby had received pay for time he did not work; these incidents were the precise subject of the lawsuit, which Plaintiff filed in February 2013. Seven months after the filing of the lawsuit, Shelby overrode Czernick's recommendation that Plaintiff receive no discipline, and Plaintiff was issued a written reprimand. Shelby could not remember any other time he overrode a recommendation of no discipline, which permits an inference that Shelby began treating Plaintiff in a disparate manner and heightened his scrutiny of Plaintiff's work. Three months later, Plaintiff was suspended for

five days for insubordination against Shelby. This suspension was reduced to two days after Plaintiff filed a grievance, which permits an inference that the discipline Shelby recommended was too severe.

Five months later, Plaintiff's lawsuit settled, and the settlement agreement required the removal of prior discipline from Plaintiff's record. Three months later, Plaintiff was promoted to Lieutenant as required by a 2012 letter of understanding between the union and the City. Monte became Plaintiff's direct supervisor, and shortly thereafter, Settles joined the City and became the head of RPD. In November 2014, five months after the lawsuit settled, Shelby ordered Salwa to investigate Plaintiff's performance, the only time a subordinate sergeant has been ordered to investigate a superior lieutenant at RPD, again permitting an inference that Shelby continued to intensely scrutinize Plaintiff's work and treat him differently from other officers. There is also some indication that when Salwa found no wrongdoing on Plaintiff's part, Shelby ordered him to look harder.

Viewing the facts in the light most favorable to Plaintiff, Settles had knowledge of Plaintiff's 2013 lawsuit when he began working for the City, because his friend Chief of Staff Dickerson had shared at least some details with Settles. Additionally, in February 2015, shortly after Settles started working in his new role, Plaintiff met with Settles and told him the details of his 2013 lawsuit. Settles asked Plaintiff if he could put all of the negative history with Shelby behind him, and Settles admitted to being disappointed when Plaintiff responded that he could not. Plaintiff testified that this is when Settles' relationship with Plaintiff became retaliatory. After that meeting, Settles spoke with Shelby and decided to monitor the interactions and disciplines between Shelby and Plaintiff, which permits an

inference that there was reason to monitor Shelby's disciplines, and that Shelby may have been scrutinizing Plaintiff's work to an unwarranted level.

About a month later, Shelby issued Plaintiff a written reprimand for failing to sign subpoenas. The record indicates that Jackson and Turner also violated the RPD subpoena protocol but received oral counseling or no discipline, indicating disparate treatment of Plaintiff on Shelby's part. Settles reduced this discipline to an oral reprimand, permitting the inference that the severity of the discipline that Shelby imposed on Plaintiff was unwarranted. A few weeks later, Shelby issued Plaintiff another written reprimand for a 3-4 week delay in returning report corrections to Shelby. The record indicates that Hull had a report correction outstanding for many months but was not disciplined for this particular violation, indicating disparate treatment of Plaintiff on Shelby's part.

Five months later, Monte initiated a request for the Director's Hearing for reasons that included Plaintiff's lack of trust in his superiors and Plaintiff not responding to progressive discipline. The hearing took place about eight months after Plaintiff disappointed Settles during their conversation about Plaintiff's 2013 lawsuit. During the hearing, Plaintiff again raised concerns that Shelby was retaliating against him for his 2013 lawsuit by singling him out and disciplining him more harshly than other officers. Plaintiff told Settles that Shelby had actually refused to speak to Plaintiff ever since Plaintiff filed his lawsuit. Settles proceeded to impose severe discipline for issues with Rodriguez—which viewing the facts in the light most favorable to Plaintiff, Plaintiff had handled appropriately by coaching Rodriguez and orally reporting her performance issues to Monte (as discussed in the arbitrator's opinion)—and for Plaintiff's trust issues and inability to work in unison with upper command. The arbitrator later concluded that there was no just cause for the severe

26

discipline that Settles imposed, which included a suspension without pay and demotion from Lieutenant to patrolman (several ranks down). Viewing the facts in the light most favorable to the Plaintiff, a reasonable juror could reach a similar conclusion. The arbitrator noted that Plaintiff had been disciplined three times in the spring, had been a Lieutenant for less than a year, and had not repeated any of the same mistakes he had been disciplined for.

The Court concludes that Plaintiff has established a causal link between his First Amendment protected activity and his subsequent discipline, suspension, and demotion.[3] *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009) (explaining that an employer cannot conceal retaliatory motive by heightening its scrutiny of the employee and waiting for or contriving an ostensibly legal basis for the adverse employment action); *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (noting

---

[3]Defendants rely in large part on *Vereecke* to argue that there is no causal link in this case between the protected activity and the adverse employment actions. The Court finds that *Vereecke* is factually distinguishable. In determining Vereecke had failed to establish a causal link, the court found that Vereecke's bad behavior served as strong motivation for the discipline issued. *Vereecke*, 609 F.3d at 401. This bad behavior included wearing an incendiary t-shirt to school basketball games he attended as athletic director; sending a controversial letter to a parent on behalf of a school committee without authorization from the committee; admittedly "blowing his temper" at a school athletic event and yelling profanity at an opposing coach and team; failing to take safety precautions and inform the administration about a controversial sportsmanship display at an athletic event that led to a fight among students; and taking a school refrigerator home without permission. *Id.* at 396-98. Further, Vereecke's supervisor had expressed displeasure with Vereecke's conduct prior to his protected activity. *Id.* at 402. In contrast, viewing the facts in the light most favorable to Plaintiff in this case, the record indicates that he was a competent officer who made some relatively minor mistakes and did not always communicate perfectly, as described by the arbitrator. *See* Dkt. # 19-41, Pg ID 644-48. Further, Plaintiff has shown that he was treated in a disparate manner, and that he was subjected to unduly harsh discipline. The Court further notes that, unlike in *Vereecke*, Plaintiff's supervisors had not expressed displeasure with Plaintiff's performance or conduct prior to the events that led to Plaintiff filing his 2013 lawsuit.

that more frequent disciplinary writeups of the plaintiff for trivial matters and unwarranted criticism of the plaintiff's work, when viewed as a whole, can support causation); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 305 (6th Cir. 2012) ("Incidents of misconduct that do not rise to the level of an adverse employment action may be relevant . . . to show a pattern of mistreatment on the job based on [the] plaintiff's protected activities."); *Handy-Clay*, 695 F.3d at 545-46 (noting that knowledge of the protected speech is relevant to causation); *Taylor v. Keith*, 338 F.3d 639, 646-47 (6th Cir. 2003) (finding that a reasonable juror could conclude that the defendants' disparate treatment of the officers involved in an arrest incident showed that the defendants targeted the plaintiff officers because of their speech, and reversing the district court's grant of summary judgment in favor of defendants).

Given that Plaintiff established a causal link, Defendants may show by a preponderance of the evidence that they would have made the same employment decisions even in the absence of the protected conduct, the filing of Plaintiff's 2013 lawsuit. Once this burden shift has occurred, summary judgment is warranted only if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant. *Dye*, 702 F.3d at 294-95. "Unlike in the *McDonnell Douglass* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Id.* at 295. A defendant's burden at this last stage of the *prima facie* case "involves a determination of fact and is ordinarily reserved for the jury or the court in its fact-finding role." *Rodgers*, 344 F.3d at 603 (internal quotation marks and citations omitted).

Defendants argue that, even if Plaintiff can establish a *prima facie* case of retaliation, the Court should dismiss Plaintiff's claims because Defendants' actions were based on legitimate business reasons, and Defendant would have taken those same actions regardless of any protected activity. According to Defendants, Plaintiff was treated consistent with other command officers and had several performance issues.

Plaintiff responds that an issue of fact exists as to whether Defendants' disparate treatment of Plaintiff was for legitimate business purposes in light of the arbitrator's reversal of the suspension and demotion, and the fact that Plaintiff was disciplined more harshly than others who engaged in the same violations.

Although Defendants provide some evidence of Plaintiff's performance issues in support of their proffered reasons for the adverse employment actions, and although there could be innocent explanations for Defendants' actions, this evidence is nonetheless insufficient to show that no reasonable juror could fail to return a verdict for Plaintiff. Viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Shelby intended to cause Plaintiff to be disciplined, suspended, and demoted, and that Shelby's sustained pattern of disparate and/or unwarranted discipline was a link in the causal chain that lead to the Director's Hearing and to the subsequent suspension and demotion. The temporal proximity between the filing of the 2013 lawsuit and the beginning of the sustained pattern of Shelby's heightened scrutiny and harsh disciplines, coupled with the disparate manner in which RPD disciplined officers for the kinds of violations at issue, constitute sufficient evidence at this stage for Plaintiff to create a genuine issue that his 2013 lawsuit was a substantial or motivating factor in his termination. The same goes for the temporal proximity between Plaintiff and Settles' February 2015 meeting during

which Plaintiff shared the details of his 2013 lawsuit, and the suspension without pay and demotion that Settles imposed in October 2015, coupled with the severity of the discipline when examined under the totality of the circumstances. "Moreover, in the First Amendment context, a defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury." *Dye*, 702 F.3d at 305 (internal quotation marks omitted) (quoting *Paige v. Coyner*, 614 F.3d 273, 282 (6th Cir. 2010)); *see Rodgers*, 344 F.3d at 603.

Viewing the facts in the light most favorable to the Plaintiff, a reasonable jury could conclude that Plaintiff's 2013 lawsuit was a substantial motivating factor in the adverse employment actions he complains of. Plaintiff has established his *prima facie* case of constitutional retaliation.

### B. Whether Settles and Shelby are Entitled to Qualified Immunity

Government officials are entitled to qualified immunity where their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Green v. Reeves*, 80 F.3d 1101, 1104 (6th Cir. 1996) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A government official will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the action at issue was lawful; but if the officer of reasonable competence could disagree on this issue, immunity should be recognized. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity is an initial threshold question the court is required to rule on early in the proceeding so that the costs and expenses of trial are avoided where the defense is dispositive. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The privilege is "an immunity from suit rather than a mere

defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.*

The first inquiry to determine qualified immunity is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). If no constitutional right would have been violated, there is no necessity for further inquiries concerning qualified immunity. *Saucier*, 533 U.S. at 201. If a violation could be made out, the next step is to determine whether the right was clearly established in light of the specific context of the case, not as a broad general proposition. *Id.* Under the doctrine of qualified immunity, an official will not be found personally liable for money damages unless the official's actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. The "clearly established" rights allegedly violated by the officials cannot be considered at an abstract level, but must be approached at a level of specificity: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). "Reasonableness" is a question of law to be decided by the trial court.

Individual Defendants Settles and Shelby argue that they are entitled to qualified immunity because they did not violate a clearly established constitutional right with regard to their interactions with Plaintiff, and there was an objectively reasonable basis for their actions under the totality of the circumstances. Defendants repeat the same arguments

discussed above, noting that Settles was not a party to the prior lawsuit, was not employed at the City when the lawsuit settled, and had never seen the lawsuit. Settles also reduced two prior disciplines issued to Plaintiff. Defendants further note that Shelby testified that he would never retaliate against someone for filing a lawsuit, and that neither Shelby nor Settles initiated the Director's Hearing; Monte did.

Plaintiff responds that qualified immunity cannot shield Settles or Shelby from liability for knowing violations of Plaintiff's constitutional right of access to the court and right to file his 2013 lawsuit.

The Court concludes that there remain genuine issues of material facts to preclude summary judgment in favor of Defendants. The Court's analysis in the preceding sections makes it clear that, taken in the light most favorable to Plaintiff, the facts alleged show that Shelby's conduct as well as Settles' conduct violated Plaintiff's First Amendment right to be free from retaliation for speaking or petitioning on matters of public concern. That right has long been clearly established in various factual scenarios as discussed in the cases cited above. *See also Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997) ("All public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern . . . ."). In light of the Court's analysis above, the totality of the circumstances, and Plaintiff's clearly established constitutional right, the Court concludes that Shelby's actions as well as Settles' actions, taken in the light most favorable to Plaintiff, were objectively unreasonable.

## C. Whether Official Capacity Claims Against Settles and Shelby are Duplicative

Defendants argue that Plaintiff's official capacity claims against Defendants Settles and Shelby should be dismissed as duplicative.

Plaintiff responds that no binding Sixth Circuit appellate authority requires dismissal of Plaintiff's official capacity claims against Shelby and Settles.

As the Sixth Circuit has explained,

> A suit against an individual "in his official capacity" has been held to be essentially a suit directly against the local government unit . . . . Official capacity suits[] generally represent only another way of pleading an action against an entity of which an officer is an agent. [] As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity.

*Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) (internal quotation marks omitted) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)); see *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993).  If a lawsuit includes individual defendants being sued in their official capacity as municipal officials and the municipal entity itself is also a defendant, then the court may dismiss the official capacity claims against the individuals as redundant.  *See Ebelt v. Cnty. of Ogemaw*, 231 F. Supp. 2d 563, 568 (E.D. Mich. 2002) (citing *Vance v. Cnty. of Santa Clara*, 928 F. Supp. 993, 996 (N.D. Cal. 1996)).

In this case, Plaintiff is asserting claims against Settles and Shelby in both their official and individual capacities, and Plaintiff is also asserting claims against the City of Romulus itself.  Accordingly, the Court will dismiss the official capacity claims against Settles and Shelby.

## IV.  CONCLUSION

For the reasons set forth above, the Court hereby DENIES IN PART Defendants' Motion for Summary Judgment (Dkt. # 17), and GRANTS IN PART the motion only as to the official capacity claims against Settles and Shelby.

SO ORDERED.

                              s/Nancy G. Edmunds
                              Nancy G. Edmunds
                              United States District Judge

Dated:  August 24, 2018

     I hereby certify that a copy of the foregoing document was served upon counsel of record on August 24, 2018, by electronic and/or ordinary mail.

                              s/Lisa Bartlett
                              Case Manager